## Mae Harrison, Appellee, v. United States Fidelity & Guaranty Company, Appellant.

### Gen. No. 33,584.

264

Opinion filed December 31, 1929.

EUGENE P. KEALY and MURPHY O. TATE, for appellant.

ALFRED ROY HULBERT and EDWIN C. PODEWELL, for appellee.

MR. JUSTICE GRIDLEY delivered the opinion of the court.

By this appeal the defendant insurance company seeks to reverse a judgment for $10,333.33, rendered against it after verdict on February 16, 1929. Plaintiff's action, commenced July 31, 1928, is in assumpsit and is based upon defendant's policy of automobile liability insurance issued to William A. Radtke on March 11, 1927, for the term of one year.

In plaintiffs' declaration (one special count) the policy is set out in full, wherein it is stated that defendant company insures said Radtke, called the assured,

"Against liability for loss and/or expense, arising or resulting from claims upon the Assured for damages in consequence of an accident occurring within the limits of the United States and Canada during the term of this policy, by reason of the ownership, maintenance or use . . . of the automobile . . . described herein resulting in:

"(A) Bodily injuries . . . , suffered by any person or persons, excepting:" (Here follow certain exceptions not pertinent to the present issues.)

The policy is limited in its coverage to a loss arising in the use of a "Buick sedan, No. 1,651,812," and, as originally written, contained a provision limiting the amount of recovery by any one person in any one accident to $5,000, but prior to the accident hereinafter mentioned this amount was increased by indorsement to $10,000. In the policy the defendant further agrees:

"(1) To DEFEND in the name and on behalf of the Assured any suit brought against the Assured to enforce a claim, whether groundless or not, on account of damages suffered or alleged to be suffered under the circumstances hereinbefore described;

"(2) To PAY THE EXPENSES incurred in defending any suit described in the preceding paragraph, also the interest on any judgment within the limits of the insurance hereby granted, and any costs taxed against the Assured on account thereof;

"(4) To EXTEND THE INSURANCE provided by this policy so as to be available, in the same manner and under the same conditions as it is available to the named Assured, to any person or persons while *riding in* or legally operating any of the automobiles covered hereunder; . . .

"(5) THE INSOLVENCY OR BANKRUPTCY of the Assured hereunder shall not release the Company from the

payment of damages for injuries sustained or loss occasioned during the life of this policy, and in case execution against the Assured is returned unsatisfied because of such insolvency or bankruptcy in an action brought by the injured, . . . then an action may be maintained by the injured person . . . against the Company *under the terms of the policy* for the amount of the judgment in said action, not exceeding the amount of the policy.''

Among the stated conditions of the policy are the following sections in ''Paragraph B'':

''(1) Immediate written notice of any accident with the fullest information obtainable at the time must be forwarded to the Home Office of the Company or to its authorized representative. If a claim is made on account of such accident, the Assured shall give like notice thereof, and . . .

''(4) The Assured shall not voluntarily assume any liability; nor interfere in any negotiations or legal proceedings conducted by the Company on account of any claim; nor, except at Assured's own cost, settle any claim; nor . . .

''(5) Whenever requested by the Company, the Assured shall aid in securing information, evidence and the attendance of witnesses in effecting settlements and in defending suits hereinbefore referred to. The Assured shall at all times render to the Company all reasonable co-operation and assistance.''

In the declaration plaintiff alleged the execution and delivery of the policy to Radtke in Chicago on its date; that on August 14, 1927, Radtke was driving ''the said automobile mentioned in the policy'' from Chicago to Lake Geneva, Wisconsin; that plaintiff and her sister, Aimee Harrison, were riding therein upon his invitation; that he negligently ran the automobile off the road and into a ditch, and as a result plaintiff and her sister each sustained bodily injuries; that thereafter, on January 10, 1928, plaintiff and her sister brought

separate suits against Radtke to recover damages; that thereafter, during May, 1928, plaintiff's suit was tried by a court and jury; that defendant by its attorneys defended the same in Radtke's behalf; that on May 23, 1928, the jury returned a verdict finding him guilty and assessing plaintiff's damages at $16,000; that on May 26, 1928, judgment on the verdict was entered against him; that neither defendant nor Radtke perfected an appeal from the judgment or sued out a writ of error; that the judgment still remains in full force and effect; that on June 26, 1928, execution thereon was issued and subsequently returned unsatisfied; and that Radtke was and is insolvent. Plaintiff in the declaration directed particular attention to paragraph 5 of the policy, and alleged that, because of the provisions of the policy and the foregoing facts, defendant was indebted to her in the sum of $10,000, together with legal interest from May 26, 1928.

Defendant filed a plea of the general issue; also an amended special plea, in which are set forth sections 1, 4 and 5 of paragraph B of the policy. It is alleged that Radtke, prior to the commencement of the suit against him, fraudulently and collusively entered into an agreement with plaintiff to defraud defendant "of the face value of the policy"; that to this end he delivered to it a false written report or statement of the accident, denying that it occurred because of his negligence and "laying the blame on a mythical third party"; that when testifying on the trial of plaintiff's suit against him (defended by defendant's attorneys) he, to defendant's surprise, voluntarily assumed liability for the accident, and stated that he had fraudulently entered into an agreement with plaintiff to defraud defendant, that while the suit was pending he was "keeping company" with plaintiff and her sister, that he had given a statement as to the accident to plaintiff's attorney admitting responsibility, and that he had cooperated with plaintiff "in arranging the details of the

friendly suit''; that, wholly regardless of his obligations to defendant, he had neglected to properly cooperate with and render assistance to defendant in the defense of the suit; that thereby he had ''breached'' the policy contract; that, because of these facts and because plaintiff's right to sue upon the policy ''is merely under the subrogation provisions of the policy,'' she has no greater rights under the policy than Radtke; and that, hence, she is not entitled to recover any sum from defendant.

To the special plea plaintiff filed a replication in which she denied all charges of fraud and collusion, or that Radtke had at any time voluntarily assumed liability for the accident, or that he had not co-operated with defendant in defense of the suit; denied that Radtke had breached any of the conditions of the policy; and alleged that plaintiff's right to sue defendant did not arise merely by subrogation, but that she was in effect an ''unnamed beneficiary'' of the policy.

Upon the trial plaintiff was represented by attorney Alfred Roy Hulbert and defendant by Murphy O. Tate, who on the former trial as one of defendant's attorneys had conducted Radtke's defense. Plaintiff introduced in evidence the policy and a certified transcript of the record of the former suit, in which were contained the pleadings, the verdict, the judgment, and the return of the execution unsatisfied. It was stipulated that defendant had received from Radtke timely notice of the happening of the accident. Plaintiff then rested.

Defendant then introduced the original report of the accident, signed by Radtke and dated August 16, 1927. He therein stated that it happened on ''Aug. 14, 1927 at 3:15 o'clock a. m.'' on ''Higgins Road, at Buttermilk Corner''; that Mae Harrison, Aimee Harrison and Walter Martin were passengers in the car and were all injured; that Mae Harrison was taken to the ''Palatine Hospital'' and there was attended by Dr. Campbell of that hospital; and that ''I was driving

west on Higgins Road. From north on cross road there suddenly entered an automobile on Higgins Road in my path. I avoided him by quickly turning left; sudden turn threw my car out of balance and it tipped over.''

Defendant also introduced Radtke's more detailed statement, dated August 22, 1927. It was stipulated that it was prepared in the office of Eugene P. Kealy, counsel for defendant in Chicago. Radtke therein stated in part:

"On August 14th, between 3 and 3:30 a. m., I was driving . . . *west* on Higgins road. . . . We were on our way to Lake Geneva, Wisconsin. The weather was clear and the concrete highway dry. I drove the car on an average of 25 miles an hour. . . . When I reached a point *about 150 feet east of a cross road,* I could see the lights of a car coming from the north. This southbound auto was *about 50 feet north* of Higgins Road *when I first saw it;* it did not stop or slow down, but turned to the east on Higgins Road; to avoid it running into my car, I turned to my left and my car went off the road and into the ditch on the south side of the road and *about 15 feet west of the cross road.* . . . Some people appeared in a car and took Martin and the two girls to Palatine Hospital. . . . I went to the hospital about 9 a. m. . . . Dr. Campbell told me that Aimee Harrison and Martin were only slightly injured, but that Mae Harrison would have to stay, as she had received a severe injury to her spine. . . . In summing up, all I can say is, that the car, southbound on the crossroad, in failing to stop or slow down at Higgins Road, caused me to turn into the ditch.''

Defendant, over objection, also introduced a letter addressed to and received by Radtke, signed by defendant, per Kealy as counsel, and dated May 24, 1928 (the next day after the jury had returned the verdict in the former suit.) Therein he was notified that, because of his claimed ''fraud and violation of the terms

of the policy," defendant "renounces any and all liability" thereunder, by reason of the accident, wherein plaintiff and her sister were injured "while they were riding as guests in *your* automobile, *insured under said policy*," and that the company had instructed Attorney Tate to take no further action in his defense, and that, should Tate do so, it would not be responsible for attorney's fees.

Defendant also introduced (and the same was read to the jury) Radtke's testimony given upon the former trial, as contained in a certain transcript, wherein it appears that he then testified on direct examination by Tate in part as follows:

"I am 35 years of age and unmarried; I had known Mae Harrison and her sister for about 3 years. I had been 'keeping company' with Aimee for some time prior to the accident. I saw her at least once a week. Since the accident I have seen her 6 or 7 times, generally at her home, and I have talked with her and Mae about the suits they had brought against me. They knew I had an insurance policy. They told me 'not to worry about anything, that the insurance company was going to take care of it all.' Later Hulbert telephoned me to call upon him, and I did so. He 'asked me things concerning the accident, which I told him about.' I saw him again. He had written out a statement, based on what I had told him, and later he mailed a copy to me, one to Martin and one to each of the girls. Later, I met him at the girls' home. The statement was read and he wanted me to sign it, but I refused. (This statement shown witness.) 'There is one or two paragraphs in here which *isn't true,* first, as to the speed, 40 to 45 miles an hour, and, second, *this car coming out of the side road;* it was *just a frame; I was the one who suggested it* in order to *protect* the girls.' Hulbert told me to read this statement over carefully and that 'when the time came to testify *the four of us would*

*testify like in this statement.'* The *'game was'* that 'I, Martin and the girls were all going to testify to this story in order to hook the insurance company.' . . . I saw Hulbert three different times. I did not then know that in the declarations which he had filed in the suits brought by the girls against me that I was there charged with wilful and wanton negligence and that I could be sent to jail if verdicts were returned against me and I did not pay. If I had known this I would not have been so anxious to help the girls."

Radtke's version of the accident, as testified on the former trial, is in part:

"After we reached Higgins road we stopped for about half an hour and . . . then started *west* again on that road. I saw a car coming with bright lights *that passed me.* I kept following the road ahead until the turn came. We went into the ditch. The lights of that other car blinded me as it approached. It was just after that other car had passed, say about 100 feet, that we went into the ditch. If the road had been straight at the time I would have made it, but it was a kind of a dangerous curve."

.He further testified on direct examination:

"The first discussion I had with the girls about bringing a suit so as to make the insurance company 'hold the bag' was *in the hospital.* I paid the hospital fees for Mae Harrison. As to why I have made a *'clean breast'* of this affair, it is because the girls *'double-crossed me,'* and 'my conscience bothered me' so much that I couldn't sleep last night. I tried to get you (Tate) at your home then I came down to your office at 8 o'clock this morning and I told you the absolute facts. I did this of my own free will. I realize the shape I am now in on this."

On said former trial Radtke was cross-examined by plaintiff's attorney, Hulbert, as to the verbal statement given to Hulbert. It appears that on said trial this

statement, as written out by Hulbert, was introduced in evidence. It is in substantial accord with Radtke's detailed statement of August 22, given to defendant, except as to the speed at which Radtke's car was moving, and except that, in the statement to Hulbert, Radtke stated that just before the accident he "saw a car coming *east* towards me with its bright lights burning, and, while I was passing him, I saw *another* car coming south on a country road about 300 feet away," and except that, in the statement to Hulbert, Radtke stated that just prior to the accident all three passengers in his car had complained of the speed at which he was driving and had requested him to drive slower. Radtke further testified, on cross-examination on the former trial, that the story (as contained in both statements) about a car coming from a cross road "was not true"; that he "had no hesitancy about telling Hulbert something that was not true"; that the reason he did not tell Hulbert the whole truth about the accident was "due to the fact of the four parties getting together and arranging this"; that he made the suggestion to the girls about "framing" the insurance company *at the hospital,* about 2 or 3 weeks after the accident; but that "the girls never made any suggestion that he 'frame' a story." At the conclusion of his testimony Radtke asked to be allowed to correct a statement made, and he stated: "You asked me whether I 'framed' the insurance company, in order for the girls to get the money? I did not."

Neither Radtke nor any other parties were called as defendant's witnesses on the trial of the present case.

It appearing, however, that Kealy, counsel for defendant, was actually engaged in court in another trial and could not be present, plaintiff's attorney agreed to allow Tate to make a statement as to such facts (not conclusions) as Kealy would if present testify to, plaintiff's attorney stating that he would not agree to be

bound by the statement, etc. Thereupon Tate made a statement, containing some conclusions and incompetent matter (objected to by plaintiff's attorney), in substance as follows:

That Kealy has been counsel for defendant in Chicago for more than 10 years; that he passes upon all claims in personal injury cases; that the only way he has of estimating "the value of a case" and deciding what is best to do from the company's financial standpoint is from the written statements as to accidents, signed by assureds; that such value is determined by a number of factors, among which are, the extent of the injuries, the probable financial loss a plaintiff has sustained, whether or not the accident occurred because of the assured's negligence, and whether or not it is a "nonliability" case; that in the present case, after he had read the statements or reports, given by Radtke, he "decided" that the accident was "unavoidable," that Radtke was not guilty of any negligence, and that there was no liability for the accident either on the part of the company or Radtke; that Kealy, relying upon Radtke's statements and making no separate investigations as to the accident, instructed Tate, one of defendant's trial attorneys, to defend said suit, which the latter did; and that neither he nor Tate knew that the accident happened in any different way until, during said trial, Radtke's testimony was given.

In rebuttal, plaintiff testified in her own behalf, and Aimee Harrison for her. Plaintiff's testimony was in substance as follows:

That it was three weeks or more after the accident that she first saw Radtke at the hospital, when he came to inquire as to her condition; that he then told her he had given a statement to the company in which he had stated that there was a car coming from a side road, and that she replied she "didn't see any such car"; that she next saw him at the hospital in October, 1927,

when in company with Martin he again called to inquire as to her condition, and that at this time nothing was said as to the accident; that she left the hospital in December and did not see him again until some time in February, 1928, when he called at her home and there was some conversation in the presence of her sister, about the suits that they had brought against him; that he called again at her home in March, 1928, and again in April, 1928; that on the latter occasion her attorney (Hulbert) and her sister were present and there was further conversation about the suits, but that no written statement as to the accident was then or ever shown to her; that neither at this meeting nor at any other interview had with him, did he ever say to her that he had given a false statement to the company concerning a car on a cross road for the purpose of "framing" the company and to "protect" her; that she never "framed" anything; that prior to the trial in May, 1928, she never saw him or her attorney except at her home, because of her condition; that since that trial she has not seen him; that she does not recall any conversation in her home, at any time during the pendency of said suit and after she had left the hospital, when Radtke and Hulbert were present, at which the details of the accident were discussed; and that "no such thing ever occurred."

Aimee Harrison's testimony corroborated that of plaintiff in essential particulars. She stated that at no meeting had at their home, when Radtke or Hulbert or both were present, was any discussion had as to "framing" the company or giving to it a false statement, and that Radtke never said to her and plaintiff, or they to him, anything regarding "framing" the company so that they might be "protected."

The main contention of defendant's counsel is that the trial court erred in not granting their motion, made at the close of all the evidence, to direct a verdict for

defendant. Counsel argue in substance that, by virtue of the provisions of paragraph 5 of the policy, plaintiff has no greater rights than Radtke; that one of the conditions under which the policy was issued (section 5 of paragraph B) was that, in the event of a suit being brought by an injured person against him and defended by the company, he should at all times "render all reasonable co-operation and assistance"; that Radtke did not do this, but on the contrary fraudulently made false statements to it concerning the accident and deceived it; that *thereby* a judgment was rendered against him in favor of plaintiff; that, in addition, after the accident and before the trial at which the judgment against Radtke was rendered, he fraudulently colluded with plaintiff to fasten ultimate liability for plaintiff's injuries upon defendant, whereas as a matter of fact the accident was unavoidable and not the result of his negligence; and that, hence, plaintiff cannot recover any sum from defendant in the present action. In support of their contention and arguments counsel cite several cases decided by New York and other courts.

It appears that in New York (section 109 of that State's Insurance Law), and in many other States, there are statutes requiring that policies of liability insurance shall contain a clause substantially the same as paragraph 5 of the present policy. In 2 Berry on Automobiles, 6th Ed., 1929, sec. 2186, p. 1769, it is said that it has been held in New York that "under this clause, the insurance company issuing a policy has the right to maintain any defense against an injured person that it could properly have urged against the insured, had he brought an action on the policy, but that the court will scrutinize with great care any defense based upon the nonobservance on the part of the insured of what may be called conditions subsequent, such as the plea of nonco-operation by insured with the

company in the defense of the action." In *Weiss v. New Jersey Fidelity & Plate Glass Ins. Co.,* 228 N. Y. S. 314, 319, it is said:

"In an action of this character it is established that the insurance company may assert any defense against the injured person which it might have asserted in an action against it by the insured. . . . It is equally well established that the obligation of good faith in carrying out what is written in a contract is a contractual obligation of universal force, which underlies all written agreements."

In *Roth v. National Automobile Mut. Cas. Co.,* 195 N. Y. S. 865, the court, after stating certain claimed reasons actuating the New York legislature in amending the insurance law so as to require all policies to have a clause substantially the same as paragraph 5 of the present policy, said (p. 867):

"If such were the reasons which moved the Legislature to enact section 109 of the Insurance Law, and if insurance companies heretofore indulged in the practice of colluding with policyholders to put them through bankruptcy in consideration of escaping liability under their policies, it would not be unreasonable to assume that they might not hesitate to escape liability to an injured person under the act by colluding with the assured after an accident by procuring him to do some act forbidden by the policy or to omit to do some act which he was obliged to do. It would thus be incumbent upon the court to scrutinize with great care any defense in a case like this, which is based upon the nonobservance on the part of the assured of what may be called conditions subsequent, such as the plea of nonco-operation here urged."

And the court, after considering the words "under the terms of the policy" (contained in clause 5 of the present policy) and the contentions of the company relative thereto, further said (p. 866):

"It seems to us that the Legislature did not intend to deprive the insurance company of any defenses which it could have properly urged against the assured under the provisions of the policy, had he brought an action thereon.''

It appears in the *Roth* case that the plaintiff had recovered a judgment against one Friedman for personal injuries received in an automobile accident, occasioned by the negligence of Friedman's chauffeur; that execution on the judgment had been returned unsatisfied; that Friedman held a liability policy issued by the company; that the plaintiff sued the company to recover the amount of said judgment; that the defense was that Friedman had breached the policy in that he had failed to co-operate with the company in the defending of the former action by signing and delivering *conflicting* written statements,—one to defendant and one to the attorneys for the plaintiff; that there was no sufficient proof of collusion between the plaintiff and Friedman; that on the trial without a jury the court found that said defense had not been established and entered a judgment against the company; and that on appeal the judgment was affirmed by the Appellate division by a divided court. After referring to the fact (as in the present case) that it is not claimed that the assured refused or neglected to aid the company as to any request made of him, it is further stated in the majority opinion (p. 868):

"It is clear that the assured falsified, either in telling the company that his chauffeur had been notified not to take out the car, excepting with his express permission, or in stating that he had given the chauffeur permission to use the car, unless he was tricked into signing one or the other of the statements. It does not appear which of the statements signed by Friedman was true, nor was there any evidence showing under what circumstances either of these statements was

prepared and signed. . . . We can find no reason for disturbing the conclusion which the court reached upon the facts.''

And in a specially concurring opinion by one of the judges it is said (p. 868):

''I do not think that the failure of the insured to co-operate after the accident, *not induced by plaintiff*, constitutes a defense. To hold otherwise puts the plaintiff *at the mercy of the owner,* who is presumptively hostile. This was not intended by the statute.''

In *Hermance v. Globe Indemnity Co.,* 223 N. Y. S. 93, two actions (tried together) were brought by plaintiffs, husband and wife, against the company, and each recovered a judgment against it for the respective amounts of judgments previously recovered against one Seides, the assured. The wife had been injured in a collision (caused by Seides' negligence) of his automobile and a bus, in which she was a passenger. The company had defended Seides in the former suits. The judgments against the company were reversed by the reviewing court, and new trials granted, because the trial court had erred in submitting to the jury a question of waiver. One of the judges, however, dissented upon the ground (p. 98) that ''plaintiff had some beneficial interest in the policy under section 109 of the Insurance Law . . . and defendant, having made an election to defend the action, cannot now, *as to the plaintiff,* assert nonliability under the policy.''

In *Coleman v. New Amsterdam Casualty Co.,* 213 N. Y. S. 522, plaintiff had a verdict against the company, which on its motion the trial court set aside and *dismissed the complaint.* It appears that the company had insured Endicott Drug Store, Inc., against loss from liability because of error in filling a prescription; that plaintiff had previously recovered a judgment against the drug company and execution had been returned unsatisfied, etc.; that the company's defense was the assured's failure to co-operate, etc.;

that the jury, in addition to the general verdict, had answered *in plaintiff's favor* the special question whether there was a "material breach" by the assured of its covenant to co-operate with the company in defending plaintiff's action; that, when plaintiff began his action against the assured, a representative of the company asked an officer of the assured "what there was to this claim of negligence," and whether or not the prescription had properly been filled; that the officer replied, "I won't tell you anything about it unless I am going to be defended"; that the officer, although admitting that a mistake had occurred, refused to say what the mistake was or to verify an answer; that after futile attempts to secure further information the company disclaimed liability; and that in the original suit against assured there was a judgment by default. It is manifest that these facts are materially different from those in the present case. It does not here appear that Radtke refused to co-operate with or assist defendant, or refused compliance with any request of defendant to that end. The trial court in its opinion in the *Coleman* case said (p. 523):

"What constitutes co-operation is *usually* a *question of fact*. (Citing numerous decisions in New York and elsewhere.) It may be excused as a matter of law, if improperly demanded. Thus, a refusal to sign an answer, if no defense in fact existed, cannot be a failure to co-operate. (Citing *Collins' Ex'rs v. Standard Accident Ins. Co.,* 170 Ky. 27, 31.) But, while the meaning of 'co-operation' cannot be expanded to include assistance in a sham defense, it cannot be contracted to exclude a fair statement of the facts of the case. The insurer has a right as a matter of law to know from the assured the facts upon which the injured asserts his claim, in order to determine for itself whether it should contest or attempt to settle the claim."

The *Coleman* case finally reached the New York Court of Appeals, and there the action of the trial court in dismissing the plaintiff's complaint was affirmed (247 N. Y. 271.) In its opinion the Court of Appeals said (p. 275):

"The argument is made that the effect of section 109 of the Insurance Law is to create an *original obligation* in favor of the injured claimant for the amount of any judgment recovered against the holder of the policy without reference to any breach of condition as between the insurer and assured. We see no basis for such a ruling. . . . By express provision of the statute, the action is to be 'maintained by the injured person . . . against such corporation *under the terms of the policy.*' If the terms could be disregarded, insurers would be helpless to defend themselves against chicanery or covin. They might then be held though there had been neither notice of the claim nor opportunity reasonably prompt to investigate the merits. . . . The plaintiff argues that a bankrupt holder of a policy colluding with the insurer could refuse to co-operate, and thus enable the insurer to cheat the statutory remedy. With equal force, the defendant can argue that a bankrupt assured could collude with a claimant to fasten upon the insurer a fictitious liability. . . . Assured and claimant must abide by the conditions of the contract."

In *Metropolitan Casualty Ins. Co. v. Albritton,* 214 Ky. 16, where the facts are similar to those in the present case and the provisions and conditions of the policy are almost identical, the holdings and decision of the Kentucky Court of Appeals are contrary to those of the New York court in the *Coleman* case. It appears that the plaintiffs, Albrittons, had recovered separate judgments against the assured, Mimms, for personal injuries and for property damage, received in an automobile accident, and, after executions had been re-

turned unsatisfied, they separately sued the company and recovered judgments against it, which the reviewing court affirmed. It further appears that to the plaintiffs' declarations the company's answers had set forth certain facts tending to show that the assured had not "co-operated" with the company; that prior to the trials the court had sustained plaintiffs' demurrers to these portions of the answers; and that these rulings were assigned as the company's first ground for reversal. In holding that no error had been committed in sustaining the demurrers, the court said (p. 19):

"The first one proceeds upon the theory that neither plaintiff has any rights under the policy except that of subrogation to those of Mimms, the assured, under it, *and which we are convinced is altogether erroneous.* The excerpt above, taken from the policy conferring a right of action upon the injured person against the company (defendant) in case of insolvency or bankruptcy of assured, *was a stipulation for the exclusive benefit of such injured person,* and it thereby created under the policy *a dual obligation* on the company in the event of the conditions named; one to the damaged person because of the accident growing out of either personal injuries or property lost, and the other to the assured; and those obligations when they arose under the policy were totally independent of each other. *Neither the assured by anything he might do could defeat plaintiff's cause of action under that clause . . .*"

In connection with this *Albritton* case, the holdings and decision in *Patterson v. Adan,* 119 Minn. 308, may be referred to, in which case, however, the policy sued upon did not contain any clause similar to paragraph 5 of the present policy, and the proceedings against the company were by garnishment on the judgment obtained against the assured. After an exhaustive dis-

cussion it was held that the trial court had erred in discharging the company as garnishee, saying (p. 314):

"We therefore hold that, in a policy such as this, where the company has come into the litigation and assumed exclusive control thereof under its contract, it *recognizes a liability,* if it fails to defend successfully, to pay the assured the amount of the judgment it so permits to be established, not exceeding the sum stipulated in the policy, and also that, *as to the plaintiff,* it should be considered that such judgment is a debt due the assured from the company, and not dependent on any contingency."

In *Solomon v. Preferred Acc. Ins. Co.,* 229 N. Y. S. 257, plaintiff, while riding as a passenger in an automobile of one Ohrbach received injuries and in a prior suit she had recovered a judgment against him and, an execution having been returned unsatisfied, she sued the company, which had issued a policy (containing provisions and conditions similar to the policy in question) to Ohrbach. Before the trial of the prior suit he had given to the company a written statement of the occurrence, which *exonerated him from liability* and placed the blame for the accident upon the driver of another car. The company defended the prior suit. One of the defenses in the suit against it (tried by the court without a jury) was that Ohrbach had failed to "co-operate" with it, in that upon the trial of the prior suit he had testified to a state of facts which showed that his negligence was the proximate cause of plaintiff's injuries. There was a finding and judgment against defendant and on the appeal the judgment was reversed and a new trial ordered. The main ground urged in the Appellate Court for a reversal was that, after Ohrbach had given his testimony tending to show negligence on his part, defendant, to establish its said defense, was not allowed by the trial court to introduce Ohrbach's said detailed statement given to it. The objection, that said statement was "not binding on this

plaintiff," was sustained. This ruling was held to be erroneous but the court in the opinion further said (p. 260):

"We express no opinion on the weight, and still less on the conclusiveness, of any of the evidence as bearing upon the issues presented. Since there is to be a new trial, . . . we deem it appropriate to point out that, when Ohrbach's statement to the defendant has been put in evidence, it is open to the plaintiff to introduce testimony tending to explain it, or the circumstances under which it was given, and, generally, to disprove its weight as establishing 'lack of co-operation' on the part of the assured. Similarly it is competent for plaintiff to prove *knowledge* on the part of the defendant of the *nature or substance* of Ohrbach's testimony before it undertook his defense as against the previous suit of the present plaintiff."

The *Solomon* case is cited by defendant's counsel as strongly supporting their contention, that the trial court in the present case should have directed a verdict in defendant's favor. We do not so regard the case, but think it an authority sustaining the contrary contention of plaintiff's counsel. Furthermore, Radtke's statements in both reports to defendant did not, on their face, exonerate him from liability as claimed, and we do not think that either defendant, or its counsel (with his ten years of experience), could have been deceived into believing that the accident was unavoidable and not due to any negligence on Radtke's part. Both statements, clearly in our opinion, disclose a decided lack of care on his part. From the statement of August 22, it is apparent that he was driving his car at an excessive rate of speed and did not have it under proper control. Moreover, if, as he says in the statement, he saw a car approaching Higgins Road and about 50 feet north of it (and to his right) when he was at a much greater distance from the intersection, it was his duty to slow down and allow said other car to

pass in front of him and he was guilty of negligence in not so doing. On the trial of plaintiff's suit against him he testified that his statement, made in said report to defendant of August 22, about a car coming from the *north* on a crossroad, was untrue. But otherwise his testimony given on the stand in said suit did not differ materially from his statement of the accident as given to defendant. In both said testimony and said statement it appears that he negligently allowed his car to get off of a dry concrete highway and into a ditch on the southerly side of the highway and that he was at the time traveling at an excessive rate of speed and did not have his car under proper control.

In the case of *Guerin v. Indemnity Ins. Co.*, 107 Conn. 649, 142 Atl. 268, decided by the Supreme Court of Connecticut, it appears that the facts and the provisions of the policy are similar to those in the present case. The plaintiff had recovered a judgment against Le Clerc (assured), execution had been returned unsatisfied, and the plaintiff sued the company, whose defense was lack of co-operation on the part of assured in the defense of the former suit, and especially the claimed making of an untruthful report of the accident, which was contrary to his subsequent testimony, virtually admitting that plaintiff's injuries were caused by his negligence. Plaintiff obtained a judgment in the suit against the company, which was affirmed. The reviewing court said in its opinion (p. 270):

"It remains to be considered whether there was such a breach of this condition of the policy by the assured. The duty resting upon the assured under this clause of the policy was to render to the defendant co-operation and assistance, presumably assistance in establishing any defense which it might have to an action upon the policy. He signed the statement, Exhibit 1, giving a version of the facts which tended to exonerate him from blame for the accident. It could hardly be

said that this constituted any failure in co-operation with the defendant, but rather the reverse. Later, upon the trial, he gave another version of the facts, which was substantially different from and conflicted with his previous statement, and which was practically a confession that the accident was the result of his negligence. It is not alleged or claimed that Le Clerc testified falsely upon the trial. . . . It cannot be said, therefore, that there was a failure of co-operation and assistance by reason of truthful testimony given by Le Clerc upon the trial. A failure to report the accident or to give notice of the suit or to give any information regarding the accident might constitute a breach of this covenant. . . . Upon this record it cannot be said that the court erred in reaching the conclusion that there was no breach of this condition of the policy.''

In *Francis v. London Guar. & Acc. Co.*, 100 Vt. 425, it was held that, in an action against an automobile owner's insurer for the amount of a judgment recovered against the insured, defendant has the burden of establishing its affirmative defense that insured failed to co-operate with defendant in defending the original suit, in accordance with the requirements of the policy.

In *Conroy v. Commercial Casualty Ins. Co.*, 292 Pa. 219, it was decided that, where the policy provided for co-operation on the part of the insured with the insurer, the latter, in order to relieve itself from liability, must show a breach of contract that is something more than a mere technical departure from the letter of the policy, and that it really suffered a substantial prejudice and injury by the conduct of the insured. The question of collusion between the insured and the person injured also was discussed, the court stating in its opinion (p. 226):

''Where there is a finding that *deliberate* misstatements were made to the *prejudice* of the surety in col-

lusion with the one injured, there is such fraud as will prevent judgment. (Citing *Bassi v. Bassi,* 165 Minn. 100.) A lack of good faith must be proved, . . . and it is not to be inferred merely from the close relations of the parties, as, for example, father and daughter-in-law. (Citing *U. S. Casualty Co. v. Drew,* 5 Fed. Rep., 2nd, 498.)''

In *Maryland Casualty Co. v. Lamarre* (N. H.), 140 Atl. 174, decided by the Supreme Court of New Hampshire, it was held to be a question of fact whether the insured in an automobile liability policy acted honestly and in good faith in the promotion of justice, in encouraging the prosecution of *his wife's* suit against him for injuries which she had sustained, testifying therein that he was drunk, admitting his liability, describing his wife's sufferings and disability, and expressing the hope that she would recover a substantial verdict.

We have reviewed the above decisions, conflicting on some points, of the courts of other jurisdictions, inasmuch as opposing counsel in their respective briefs state that they have been unable to find any adjudicated case in either the Supreme or Appellate Courts of Illinois directly bearing upon defendant's counsels' main contention and arguments. Our additional search for such a case has not been rewarded.

In view of the general trend of these decisions and holdings, the terms and provisions of the policy, the pleadings in the present case, the conflicting testimony on the question of collusion, and of all the facts and circumstances in evidence, we are of the opinion that the trial court did not err in refusing to direct a verdict in defendant's favor. Whether Radtke rendered all reasonable co-operation and assistance to defendant, whether he intentionally made false and fraudulent statements to defendant as to the accident shortly thereafter, whether defendant relied upon the same or it or its counsel were deceived thereby, and whether

Radtke after the accident and before the trial of the suit against him fraudulently colluded with plaintiff to fasten ultimate liability for her injuries upon defendant, were all questions of fact for the jury and not for the court to determine. And it certainly cannot be said that the jury's verdict is manifestly against the weight of the evidence. And we think that the judgment entered upon the verdict is amply sustained by the law, according to the general current of authority in jurisdictions outside of Illinois, and should be affirmed.

Defendant's counsel also complain of the instructions to the jury. Thirteen were given—three offered by plaintiff and ten by defendant. Three others offered by defendant were refused. It is contended that the giving of instruction No. 2, offered by plaintiff, was error. Considering the instruction in its entirety and in connection with all other given instructions, we cannot agree with the contention. It is urged in the argument in connection with this instruction that plaintiff did not prove that the particular car mentioned in the policy was the car involved in the accident. Plaintiff alleged in her declaration that it was the same car; defendant did not deny the fact in its special plea and its plea of the general issue did not put in issue the fact; furthermore, in defendant's letter to Radtke of May 24, 1928, introduced by defendant, there is a direct admission of the fact. And we do not think that the court committed error in refusing to give the three refused instructions offered by defendant, especially when all given instructions are considered. We are of the opinion that the jury were fairly instructed.

The judgment appealed from is affirmed.

*Affirmed.*

BARNES, P. J., and SCANLAN, J., concur.