Clark M. Jackson for Use of Richard E. Schaer, Appellee, v. Bankers Indemnity Insurance Company, Garnishee, Appellant.

Gen. No. 37,352.

Opinion filed October 16, 1934.

CASSELS, POTTER & BENTLEY, for appellant; RALPH F. POTTER, LESLIE H. VOGEL and E. DOUGLAS SCHWANTES, of counsel.

RICHARD E. KEOGH, WILLARD BALHATCHETT and JOHN D. POPE, for appellee.

MR. PRESIDING JUSTICE GRIDLEY delivered the opinion of the court.

On June 3, 1933, Richard E. Schaer recovered a judgment against Clark M. Jackson for $4,000, following the verdict of a jury, for damages for personal injuries received early in the morning of August 8, 1931, and occasioned by the negligent driving of an automobile by Jackson, which was owned at the time by Vincent C. Fischer. After an execution on the judgment had been returned unsatisfied the present garnishment suit was commenced on August 18, 1933, against the Bankers Indemnity Insurance Co. (hereinafter referred to as the Insurance Co.), based upon an ''omnibus'' coverage clause, as it is sometimes called, contained in the policy of automobile liability insurance, issued by the Insurance Co. to Fischer and in force at the time of the accident. The issues were made by the interrogatories filed by the beneficial plaintiff, answers thereto by the Insurance Co., and a replication to the answers. In the answers of the Insurance Co. it stated that the nature of its defenses to the suit were in substance (a) that Jackson, as the ''additional insured,'' was not at the time and place of the accident ''legally operating'' the automobile; (b) that he was not then operating it ''with the *permission* of the named assured, Fischer''; (c) that Jackson was guilty of a breach of the insurance contract in making false statements to the Insurance Co. respecting the accident, and in failing and refusing to ''co-operate'' with it in the defense of the suit brought by Schaer against him. During October, 1933, a trial of the issues was had before the court without a jury. On the trial the beneficial plaintiff introduced the policy in evidence, gave certain testimony in his own behalf, and called Jackson and Fischer as witnesses. They were examined and cross-examined at considerable length. The accident occurred about 5 o'clock in

the morning at or near the intersection of 51st street and Cottage Grove avenue, Chicago. Jackson testified in detail to certain occurrences leading up to the accident and certain happenings thereafter. For the Insurance Co. four witnesses testified, three of them being police officers. The Insurance Co. also introduced in evidence a written statement as to the accident, etc., signed by Jackson in a Chicago police station on the morning of August 8, 1931, about four or five hours after the accident. The Insurance Co. also introduced in evidence a certain statement, prepared by representatives of the Insurance Co., and signed and sworn to by Jackson on September 30, 1931, about seven weeks after the accident. After one of the police officers, Meehan, had testified to the effect that, when the statement was signed by Jackson in the police station, Jackson "had signs of drink upon him" and "was very nervous," the court struck from the record the statement on the theory that Jackson was drunk at the time he signed it. The Insurance Co. also introduced in evidence a certain "Defense and Non-Waiver Agreement," dated December 17, 1931, and signed by Jackson, Fischer and the Insurance Co., wherein the company agreed to defend without expense to Jackson the lawsuit which had been commenced by Schaer against him, and wherein, in consideration thereof, all parties agreed that the Insurance Co. did not, because of such agreement to defend or of any act to be done thereunder, waive any defense that it might have to the making of any payment under the policy. On October 24, 1933, at the conclusion of the trial, the court found the issues for the plaintiff and against the Insurance Co., assessed plaintiff's damages at $4,-078.30, and entered judgment against the Insurance Co. in that sum. By the present appeal it is sought to reverse the judgment.

The material provisions of the policy, which was issued to Vincent C. Fischer, as the "Assured," on

April 20, 1931, and for a period of one year, are as follows:

"(1) To pay any loss (within the limits as expressed in the Declarations) resulting from the liability imposed by law upon the Assured for damages on account of bodily injuries, and/or death resulting therefrom, accidentally suffered, or alleged to have been suffered, by any person or persons, by reason of the ownership, maintenance and/or use of any of the automobiles described in said Declarations (including carrying of goods thereon and the loading or unloading thereof).

"(6) ADDITIONAL ASSURED. This policy shall apply in the same manner and under the same conditions as it applies to the Named Assured, to (a) *any person* or persons while riding in or *legally operating* any of the said automobiles and to any person, firm or corporation (except an automobile garage, repair shop, automobile sales agency or service station or the agents or employees thereof) legally responsible for the operation thereof, *provided such use or operation is with the permission of the Named Assured,* or, if the Named Assured is an individual, with the permission of an adult member of the Named Assured's household other than a chauffeur or a domestic servant, (b) the immediate next of kin or legal representative of the Named Assured in the event of the Named Assured's death."

Among the "Declarations" of the policy is the following item:

"4. The Company's liability under insuring agreement (1) for loss on account of an accident resulting in bodily injuries to and/or death of one person whether there be one or more Assured, is limited to $5,000; and, subject to the same limit for each person, the Company's total liability for loss on account of any one accident or series of accidents arising from one

and the same cause resulting in bodily injuries to and/or death of more than one person is limited to $10,000.''

Among the numerous ''Conditions'' of the policy are the following:

''D. REPORTING ACCIDENTS, LOSSES AND CLAIMS.— REPORT AND DEFENSE OF SUITS.—CO-OPERATION OF ASSURED. The Assured, upon the occurrence of an accident, shall give immediate written notice thereof to the Company with the fullest information obtainable. He shall give like notice with full particulars of any claim made on account of such accident. If suit is brought against the Assured to enforce a claim for damages covered by this Policy, the Assured shall immediately forward to the Company every summons or other process as soon as the same shall have been served on the Assured. Nothing elsewhere contained in this Policy shall relieve the Assured of his obligations to the Company with respect to notice as herein imposed upon him. The Assured shall at all times render to the Company all co-operation and assistance in his power. . . .

''The Assured, whenever requested by the Company, shall aid in effecting settlements, securing information and evidence, the attendance of witnesses and in prosecuting appeals, but the Assured shall not voluntarily assume any liability or interfere in any negotiation for settlement, or in any legal proceeding, or incur any expense, or settle any claim, except at the Assured's own cost, without the written consent of the Company previously given.''

The salient facts as to the accident, and the events and happenings before and immediately after, are in substance as follows:

Fischer was a commercial artist, resided at Waukegan, Illinois, but also had an apartment at 636 Addison street, on the north side of Chicago. Jackson also

was an artist, having his studio at 43 East Ohio street, Chicago. During the early evening of Friday, August 7, 1931, Fischer and Jackson were in the company of certain of their friends, two men and two women. They drank a number of gin highballs together. Later the party went to Fischer's apartment, where more drinks were had. About midnight, several of the guests expressed a desire to go to their respective homes on the north side of Chicago, and, with Fischer's permission, Jackson drove three of the guests to their homes in the automobile. Fischer had frequently before given Jackson permission to drive his car. Siegel, one of Fischer's guests, remained in the apartment, to which Jackson returned in the car at about 1:30 o'clock on Saturday morning. Upon Siegel's expressing the desire to be driven to his home in Berwyn, Illinois, Jackson, with Fischer's permission, agreed to do so. Fischer then stated that he felt ''pretty tired,'' that he had to be in Lake Bluff, Illinois, the following morning (Saturday), and that it would be all right with him if Jackson returned with the car in time for him to make his contemplated trip in the car to Lake Bluff. Fischer gave no instructions to Jackson as to the route he should take in going to or returning from Berwyn. Jackson drove Siegel in the car to Berwyn. On his return trip, alone, and after reaching 22nd street, Chicago, Jackson drove the car in that street as far east as Michigan avenue, when he turned to the north and was proceeding north, when at about 17th street he ''had a flat tire—a blowout or a puncture,'' and he stopped near a lamp post and got out and looked at the tire. As to the happenings thereafter Jackson testified as follows:

''While I was looking at the tire, there were a couple of colored men come along, and as I was 'rather tired,' I leaned up against this post, watching one of the men working on the tire. I don't know where the other

one was. When he was through and was giving me back my keys, and I had stepped off of the curb to pay him, there was a sort of a crash, and *I don't recall anything else.* This happened as I had put my hand in my pocket to pay the colored man for fixing the tire. . . . The next thing that I recall that morning is that blood was running out of the side window of the car and blood was running down on my forehead; I had heard a crash, of course, and I knew that I was cut; I was stunned and dazed; and that is my first recollection after having offered to pay these men. . . . I had the puncture at 17th and Michigan avenue, and I learned later that the accident was at 51st and Cottage Grove avenue.'' (This last named location, as testified by a witness called by the Insurance Co., is about four miles *southerly* from 17th and Michigan avenue.)

Jackson further testified on cross-examination:

''I wouldn't really know what time it was when I had that puncture. It would depend on how long it took me to drive in from Berwyn to that point. It was possibly 3:30 o'clock. . . . After the' accident (which occurred about 5 o'clock) I was taken to a police station and at 8 o'clock, a. m., I talked with some police officers there. (His signed statement afterwards delivered to those officers then exhibited.) I really don't know whether I said the following to those officers, but I would not say that I did not, viz.: 'I drove Siegel home and returned on Oak Park Blvd., until I hit 22nd st.; then I went east to Michigan avenue; then I had a flat tire and two colored men changed the tire; then I got in the car and *started north* and I remember nothing further until I hit the milk wagon at 51st street and Cottage Grove avenue; then someone called the police wagon and brought me into the station, and I am not sure where I received first aid.' ''

John R. Cretz, one of the witnesses called by the Insurance Co., testified in part as follows:

"On the morning of August 8, 1931, I was a police officer at the station at 48th and Wabash avenue, Chicago, assigned to 'wagon' duty. About 5 o'clock that morning I received a call to go to 51st street and Cottage Grove avenue. I went there with two other officers. I saw a milk wagon tipped over and milk bottles on the street. I was told the driver (Schaer) of the milk wagon had been badly injured and had been taken to the Chicago Hospital. I found that the horse had a broken leg and we had to shoot the horse. My attention was called to a man sitting in a nearby automobile. Some one said 'Don't let that fellow get away; he pretty near killed the driver.' So I opened the door and asked the man (Jackson) sitting in the car, 'What happened?' He replied: 'I was to a party last night with a lot of ladies, and we drank a lot of ginger ale highballs, and that's about all I remember.' He had a laceration on the top of his head, and he said he wanted to be taken to the hospital. So I took him to the same hospital that the driver had been taken to. After he had been given treatment there, I took him to the police station. At that time I had an opportunity to observe Jackson. I don't know what was his then condition with reference to sobriety and intoxication."

On the issue raised in the garnishee's answer that Jackson, as the "Additional Assured," had breached the contract of insurance in that he had made "false statements" to the company respecting the accident and in that he had failed and refused to "co-operate" with it in the defense of the suit brought by Schaer against him, the uncontradicted testimony of Jackson is in part as follows:

"Representatives of the Insurance Co. asked me to make statements to them as to how the accident happened. I did so. They were true. They had me down at their office a number of times and I conferred with them from time to time regarding the accident. The

law suit against me was tried twice. I was present at the first trial, sitting at the table with Mr. Vogel (one of the attorneys for the Insurance Co.). I was not called as a witness at that trial and gave no testimony. . . . On the morning the case was called for trial the second time, I remember having a 'phone conversation with Vogel. . . . I was ill at the time and I told him that I didn't feel like coming to court. . . . He said it was all right if I was ill, and that I need not attend the trial. . . . I don't recall any other thing that the company asked me to do that I did not do. . . . When the $4,000 verdict was returned by the jury in the case I was not present in court. . . . I know Mr. Williams who is an employee of the company. He asked me to make the written statement of September 30, 1931. I read the statement as prepared before signing and swearing to it before a notary. . . . The statement was given to Williams pursuant to his request that I tell how this accident happened. . . . Subsequently there were conferences with reference to the company defending me under the policy. . . . These conferences resulted in the execution of the agreement of December 17, 1931.''

From a comparison of Jackson's written statement of September 30, 1931, prepared by representatives of the company, with his testimony given on the trial of the present case in October, 1933, it appears that the *facts* as stated on the two occasions are substantially similar. There are, however, certain matters mentioned in the written statement that do not appear in his testimony on the trial. In the written statement it is stated that shortly after the accident, ''a man stuck his head in the window and told me to take it easy until the police arrived''; that when the police arrived ''I got out of the car in a dazed condition, and was taken to the hospital where my head was stitched and dressed''; that from there ''I was taken to a police

station at 48th street and Wabash avenue, and put in a cell and held *incommunicado until 4 o'clock, a. m., August 10, 1931"*; that "I went to court at 9:30 a. m. that morning, where I was charged with 'Assault and Battery with a deadly weapon' and released on a $1,000 bond, and the case continued until September 23rd." These statements as to his inability to communicate with Fischer, or others, until early Monday morning are corroborated by Fischer's testimony on the trial that, after Jackson had left his apartment in company with Siegel early on Saturday morning, August 8th, he "next heard from Jackson some time early Monday morning, about 4 o'clock," and later the same morning "went to the court where Jackson was and then went and reported matters to the agent with whom I had taken the insurance." And there are certain statements at the end of Jackson's written statement of September 30, 1931, in the nature of *conclusions,* rather than statements of *fact,* in part as follows:

"When I left 636 Addison street to take Siegel home, it was expressly *understood* between myself and Fischer that I was to return with his car directly from Berwyn, . . . and I *had no authority to deviate* from my course, or to drive his car throughout the city, but was to return directly to his apartment. . . . From the time of the punctured tire up to the happening of the accident *there was a deviation* and I was not returning to 636 Addison street. I heard a crash and the breaking of glass, but did not see a horse or milk wagon. On the afternoon of August 8, 1931, while I was in jail, I felt a large bump on the back of my head about the size of a chicken egg, and the back of my neck has been stiff and sore ever since."

Three contentions, urging a reversal of the judgment appealed from, are here made by counsel for the Insurance Co. The first is that the evidence clearly discloses that Jackson "at the time and place of the

accident'' was not operating the automobile with the ''permission'' of the named assured in the policy. And counsel argue in substance that the judgment is erroneous under a proper construction to be placed upon paragraph 6 of the policy; that while in the policy delivered to Fischer it agreed to cover any other person using and operating his automobile, it did so with the proviso that such use and operation by such other person was to be ''with the permission of the named assured'' (Fischer); that it sufficiently appears that at the time and place of the accident Jackson was ''no longer'' using and operating the car with Fischer's ''permission''; and that, hence, the Insurance Co. is not liable under the policy to the beneficial plaintiff, Schaer, in this garnishment proceeding. In support of their contention and argument counsel cite in their briefs several adjudicated cases in jurisdictions other than Illinois, and they state that the courts of review of Illinois ''seem not to have been called upon to decide any case analogous to the one at bar.'' Among the cases cited are: *Johnson v. American Automobile Ins. Co.*, 131 Maine 288; *Frederiksen v. Employers' Liability Assur. Corp.*, 26 F. (2d) 76; *Trotter v. Union Indemnity Co.*, 35 F. (2d) 104; *Jones v. Cella*, 284 Mass. 154, 187 N. E. 294; *Nicholas v. Independence Indemnity Co.*, 11 N. J. Misc. 344, 165 Atl. 868. In the *Johnson* case (131 Maine 288) the defendant had executed and delivered to one Becker a policy of liability insurance covering his automobile. The policy had an ''omnibus'' or ''additional coverage'' clause in it similar to the present one. While it was in force one Rix, an employee of Becker, crashed his car into a telephone pole to the injury of the plaintiff, a young woman riding gratuitously in the car. She brought a tort action against the driver, Rix, and after verdict obtained a judgment against him for $1,800. The judgment remaining unsatisfied she sued in equity, under

a Maine statute, to reach and apply the insurance money in the amount of the judgment. The cause was heard on bill, answer, replication and proof, but the trial court decreed that her bill be dismissed. On appeal the decree was affirmed. On the trial the court "found the fact to be" that, on the ride involving the accident, the car "was not being used with the consent, express or implied, of the 'named assured' (Becker), but that the employee (Rix) was using it in disregard of, and unrelation to, the specified object for which it had been intrusted to him."

In the opinion of the Maine court (p. 290), after stating that the evidence of the case "abundantly sustains the finding" of the trial court, and that the trial court "concluded, as a matter of law, that Rix was not covered by the terms of the policy, as to the accident," there is a somewhat lengthy discussion of some of the numerous decisions cited by the plaintiff's counsel, in which a contrary conclusion was reached. And then the court says (p. 292): "Without discussing other cases, thus was it concluded that, *initial use* of the car having been with the owner's permission or consent, liability insurance *became available.*" And the court further said (pp. 292, 293, italics ours):

"Touching the question here presented, the cited decisions are not persuasive. . . .

"In the instant case, the instruction by the employer, that Rix should take the car home and wash it, was *simply consent that the car be used, within reasonable and incidental limits, for that purpose.* Such use brought the employee within the additional coverage clause in the liability policy. If, while consent continued, civil liability for damages had been incurred, the policy would have afforded security.

"*But, as the justice found*—and his finding has the weight of a jury verdict—*the car was not, when the employee's guest was injured, 'being used with the*

*consent of the named assured.'* The plaintiff could not, therefore, avail herself of the insurance.

"The phrase 'while being used' has been construed as referring *to the time of casualty,* and not to the time of granting consent. (Citing a case.) Permission to use an automobile *to attend a funeral* was not inclusive of a *pleasure trip* (citing the *Frederiksen* case, *supra,* 26 F. (2d) 76, decided by the U. S. Court of Appeals for the ninth circuit). Express permission for one purpose did not imply all purposes. (Citing the *Trotter* case, 35 F. (2d) 104, *supra.*) . . . The terms of a policy cannot be enlarged or diminished by judicial construction. (Citing a case.) The function of the court is not to make a new contract, but to ascertain the meaning and intention of that actually made."

The facts of said *Johnson* case are materially different from those in the instant case. And the facts of the other four cases, cited by counsel for the Insurance Co., are also materially different from those in the instant case. It will be noticed that in the *Johnson* case the trial court found *as a fact* that the car in question was *not* being used by the driver at the time of the accident with the consent or permission of the owner thereof, while in the instant case the finding of the trial court was in effect to the contrary. It will also be noticed that in the *Johnson* case, as well as in said other four cases, there appears to have been a definite and deliberate *intention* on the part of the driver of the car to perform some other personal errand outside of or beyond the use for which permission had been granted by the owner, while in the instant case we are of the opinion that its peculiar facts are such as to indicate, and to justify the trial court (sitting in place of a jury) in believing, that Jackson at the time and place of the accident and prior thereto had no such intention. And our attention has been directed by plaintiff's counsel to the cases of

*Dickinson v. Maryland Casualty Co.,* 101 Conn. 369, and *Stovall v. New York Indemnity Co.,* 157 Tenn. 301, where the conclusions reached, and the holdings of the Supreme Courts of those States, we regard as contrary to those in the *Johnson* case. In the majority opinion in the *Dickinson* case, it is said (p. 381, italics ours):

"Louis Maisano gave permission to Riccitelli to take the car and operate it on the streets of New Haven, in order to go to his home. It would be an unreasonable curtailment of the permission granted, to hold that any deviation or departure from the purpose indicated by Riccitelli in his request, annulled the permission and put Riccitelli in the position of one unlawfully using the car. Riccitelli undertook to take a friend in the car a mile toward his home in the northern part of the city, and another friend to his home near that of Riccitelli in the southern part of the city. These slight deviations from the route to his home, in a swiftly moving automobile, are too unimportant to have attached to them by construction the import of *annulling the protective features of this insurance policy.*"

In the *Stovall* case (157 Tenn. 301), the so-called "omnibus" clause in the policy is almost identically the same as paragraph 6 of the present policy. The complainants were injured in a collision with one of the automobiles owned by the Dry Goods Co., covered by the policy, and they secured judgments for damages against one Thomas, a traveling salesman of the company, who was driving the car when the collision occurred. Thomas' insolvency having been determined by a *nulla bona* return of the executions issued against him, complainants commenced a further proceeding in a chancery court, upon the theory that they were entitled to a decree against the Indemnity Co., Thomas being an "additional insured." The Indemnity Co. interposed the defense that "at the time of the acci-

dent and injury," Thomas was not operating the car with the "permission" of the Dry Goods Co., and that, hence, Thomas was not an "additional assured" within the terms of the policy. Complainants demanded a jury and an issue of fact was submitted to them, calling for a response whether the car, driven by Thomas, was being used or operated at said time with the "permission" of the Dry Goods Co. At the conclusion of complainant's evidence, consisting of the testimony of the president of the Dry Goods Co. and the deposition of Thomas, the Indemnity Co. moved for a directed verdict in its favor. After argument on the motion, the chancellor discharged the jury, entertaining the view that the evidence had developed no *controverted* question of fact and that under the uncontradicted evidence the right of complainants to a recovery depended only upon the proper construction of the contract of insurance, which was a question of law. And the chancellor entered a decree in favor of complainants, which subsequently was affirmed by the court of appeals. On petition for certiorari, granted by the Supreme Court, the decree of the court of appeals was affirmed, the court saying in part (pp. 314, 315, italics ours):

"It is our opinion that the words 'providing such use or operation is with the permission of the named assured' were intended to exclude from the protection of the policy a person who should take the automobile and use it without permission or authority *in the first instance*. If, however, the automobile covered by the policy is delivered to another for use with the permission of the owner or insured, his subsequent use of it is with the permission of the insured, within the meaning of the policy, *regardless of whether* the automobile is driven to a place or for a purpose not within the contemplation of the insured when he parted with possession."

The *Stovall* case is also reported in 72 A. L. R., p. 1368, and following the opinion, commencing at p. 1375, there is an exhaustive annotation discussing many adjudicated cases in various jurisdictions, where similar "omnibus" coverage clauses were involved. The cases are not harmonious. But on pp. 1388, 1389, of the annotation the author says: "The question of permission is *one of fact*. (Citing cases.) As regards the fact of permission, the burden of proof rests upon the plaintiff. To the latter proposition no citation of cases is necessary. . . . Where the evidence on the question of permission is *conflicting*, or *reasonably susceptible to opposing inferences*, the findings of the trial court—a jury having been waived—with respect thereto, are controlling." (Citing the *Trotter* case, *supra*, 35 F. (2d) 104, 105.)

In view of the evidence in the present case, and considering the authorities above referred to, we are unable to agree with the first contention and argument of counsel for the Insurance Co., above mentioned. Inasmuch as under all the evidence the court, sitting in place of a jury, determined in plaintiff's favor the question of fact as to Fischer's permission, we are not disposed to reverse the judgment against defendant. It seems clear to us that the court's finding is not manifestly against the evidence. If, however, under the evidence, the particular question can be considered to be one of law, as distinguished from one of fact, we are of the opinion that the judgment of the trial court is sustained by the weight of authority in this country.

The second contention of counsel for the Insurance Co., as a ground for a reversal of the judgment in question, is that the evidence discloses that Jackson "breached the co-operation provision of the policy and the plaintiff claiming through him cannot recover." In view of the provisions in paragraph "D" of the policy above outlined, and the evidence bearing upon

the particular issue, we are of the opinion that the contention is without merit. In an exhaustive annotation in 72 A. L. R., p. 1446, concerning such provisions in policies of liability insurance, it is said (p. 1454): "What constitutes co-operation (or the lack of it) on the part of the assured, within the meaning and effect of co-operation clauses, is usually a question of fact." See, also, *Harrison v. United States Fidelity & Guaranty Co.,* 255 Ill. App. 263, 279, 287. (Certiorari denied, 256 Ill. App. xliv.) It is apparent that the court by its finding in the present case found against the Insurance Co. on this issue, and clearly the finding is not against the evidence. (See, also, *Duffy v. Fort Dearborn Casualty Underwriters,* 270 Ill. App. 143, 149; *Conroy v. Commercial Casualty Ins. Co.,* 292 Pa. 219, 224, 225.)

Equally without merit, in our opinion, is counsels' third and last contention that the trial court committed reversible error in striking from the record the written statement that Jackson made to the police officers, while in their custody a few hours after the happening of the accident. Even if it could be considered that the court erred in the ruling, it would not be such an error as would warrant a reversal of the judgment, in view of all the admitted evidence.

For the reasons indicated the judgment of the superior court of October 24, 1933, against the Insurance Co. for $4,078.30 should be and is affirmed.

*Affirmed.*

SCANLAN and SULLIVAN, JJ., concur.