## METROPOLITAN CASUALTY INS. CO. OF NEW YORK v. RICHARDSON et al.

### No. 939.

United States District Court
S. D. Illinois, S. D.
Dec. 10, 1948.

Clausen, Hirsh & Miller, of Chicago, Ill., and Graham & Graham, of Springfield, Ill., for plaintiff.

Robert M. Magill, of Springfield, Ill., for Richardson.

Frank Mattes, of Jefferson City, Mo., and Geo. Wm. Cullen, of Springfield, Ill., for Ehrgott.

BRIGGLE, Chief Judge.

The plaintiff, the Metropolitan Casualty Insurance Company of New York, a New York corporation, brought this proceeding for a declaratory judgment under the Declaratory Judgment Act of June 14, 1934, as Amended, for the purpose of procuring an adjudication as to coverage of a policy of insurance issued by it to the defendant, Jack Richardson, indemnifying him against liability for bodily injury or property damage that might be caused in the operation of a 1938 Dodge automobile described therein.

The policy of insurance among other things provided:

"18. Fraud and Misrepresentation. This Policy shall be void if the insured has concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof or in case of any fraud, attempted fraud or false swearing by the insured touching any matter relating to this insurance or the subject thereof, whether before or after a loss.

"19. Assistance and Cooperation. The insured shall cooperate with the Company and, upon the Company's request shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative at the time of accident."

On September 29, 1946, the insured was maintaining and operating the Dodge automobile described in said policy, on a highway in the State of Illinois about one mile East of Lima, Illinois. While the defendant Louis Ehrgott, the father-in-law of the defendant, Jack Richardson, was either sitting or lying in the luggage compartment or standing outside of said automobile, and reaching in the luggage compartment for his gun, the lid or cover of said luggage compartment fell, as a result of which it is claimed that the defendant Louis Ehrgott sustained a fracture of the cervical vertebra.

On October 14, 1946, on a printed form issued by the company, captioned, "Automobile Accident Report", the defendant Richardson gave the following account of the accident: "We stopped to get a gun out of the rear of the car. As Mr. Ehrgott reached for his gun the turtle top fell hitting him on the neck breaking a vertebra on the left side. I rushed him to the Blessing Hospital in Quincy where exrays were taken and he was put in a cast. This is the first chance to make out this report as I didn't have the address of the Insurance Co."

On October 25, 1946, Richardson gave to one of the adjusters employed by the plaintiff, a conflicting statement of two pages, in which he said among other things: "My car is a business coupe and my wife and Ethel Clark, 514½ Hampshire, Quincy, and I were on front seat and my father-in-law was seated on floor of the trunk, and the trunk door was raised up and open. As I was about one mile from Anderson's farm I turned off a cement highway onto a gravel road, making a right turn and there was a break in the cement road leaving a hole about three or four inches wide and a couple of inches deep, and I slowed down almost to a stop to cross this break. But as my rear wheels crossed this break, the trunk door fell down and struck my father-in-law on top of his head, and also struck him on back of his neck. I have had trouble with the old hinge and lock which holds up the trunk door, and the day before the accident, I bought a lower half of a hinge from a used parts dealer named Ferguson in Quincy and this part was taken off of a wrecked car I think, but looked new and a man there helped me put it in my car. I also bought a speedometer cable, a head light lens, right tail light lens and all were put on at Fergusons place. I tried out the new lower hinge and raised and lowered the trunk door, and it appeared alright and stayed locked where raised and was working in good condition until I went over the break in the road and it fell down on my father's-in-law head."

On February 5, 1947, the defendant Richardson was asked by plaintiff's employees certain questions relative to the accident and relative to the condition of the car. His statement at that time in question and answer form went as follows:

"Q. You put a new hinge on there? A. Yes, I went and got some stuff. * * *

"Q. And when had you made this replacement? A. The second day after I was there.

"Q. A day or two before this accident? A. Yes. I think it was on a Friday or Saturday. * * *

"Q. Was the trunk all right for—was it holding the trunk lid up when you wished it to be held? A. Yes.

"Q. And it had a good grasp on it? A. Yes, it seemed to have. Just that the

vibration, when it bounced or anything, it came down.

"Q. Then you had no other occasion to try it? A. No. The first time it wouldn't hold, the first one was worn too bad.

"Q. But that precedes the accident, the first one? A. Yes.

"Q. It had nothing to do with the accident? A. Yes.

"Q. And you put a new one in? A. Yes.

"Q. And the new one was holding the trunk lid open when you wanted it held open? A. Yes.

On May 6, 1948, the defendant Richardson was again asked certain questions by the plaintiff relative to the accident in question. He then stated:

"Q. So that then, reviewing the situation, Mr. Richardson, three times, on October 15th, 1946, again on February 5th, 1947, and the last time on January 28th, 1948, you have unequivocally and positively stated that there was a new latch put on your trunk lid by yourself and this man the day before the accident happened?" * * * A. That is right.

"Q. And now you are telling us that is not so? A. I know now.

"Q. Who told you to say that? A. Nobody told me. I know, because why would I put a headlight lens in it if I did not need one.

"Q. Didn't you say in this February 5th, 1947 statement that you asked the man at the junk yard, who was in dirty clothes and whose hands were greasy, to put that latch on for you? A. He offered to help me.

"Q. And you asked him to do it and he did put it on for you? A. That is right.

"Q. The day before the accident? A. It was the day after.

"Q. No, I am asking you if you didn't say that on February 5th, 1947, that it was the day before the accident? A. Yes.

"Q. And the same thing in a sworn statement on January 28th, 1948? A. Yes. * * *

"Q. Don't fib me like that. Who told you it was important— A. Nobody.

"Q. —to say that the repairs were made the day after the accident instead of the day before? A. Nobody.

"Q. Did your father-in-law tell you that? A. No.

"Q. Did your father-in-law's lawyer tell you that? A. No.

"Q. Who dreamed that up? A. No. He had been hounding me about the latch and stuff, so I figured it must be important, so I was talking to her about it one night and she said, 'Well, don't you remember that headlight lens was broke at the bridge,' and the next day I had it fixed. It was the day after the accident. * * *

"Q. Mr. Richardson, a moment ago you said something about trying to help your father-in-law in the first statement, and I believe you referred to the one of October, 1946, is that right? Is that what you were referring to? A. I don't know what the date was.

"Q. Well, I will show it to you. This statement, that bears your signature four times, October 25th, 1946, is that the one you referred to, when you said you were trying to help your father-in-law? A. I guess that is it.

"Q. What did you mean when you said you were trying to help your father-in-law in that statement? A. Well, I thought he would maybe get compensation or something for being off work.

"Q. This is the statement where you said at the time he was injured he was standing on the ground and reaching into the trunk to get out the gun. * * * A. Yes.

"Q. And that was not true, was it? A. No.

"Q. And the reason you said it was to help your father-in-law? A. That is right.

"Q. In that statement you said that you had repaired this latch on the trunk lid the day before the accident; was that correct? A. No, that was wrong."

On January 23, 1948, the defendant Louis Ehrgott filed an action in the Circuit Court of the City of St. Louis, State of Missouri, against the defendant Richardson to recover damages alleged to have been suf-

fered by him in the sum of $15,000 by reason of the claimed negligence and wilful and wanton conduct of the defendant Richardson arising out of the operation and maintenance of the Dodge automobile on September 29, 1946. It was specifically alleged in said action that the defendant Richardson was guilty of wilful and wanton conduct by permitting the plaintiff Ehrgott to ride in the luggage compartment of the automobile knowing that the lever supporting the cover or lid to said luggage compartment was defective. On October 15, 1946, again on February 5, 1947, and the last time on January 28, 1948, the defendant Richardson stated unequivocally and positively that there was a new latch put on the luggage compartment prior to the accident. On May 6, 1948, for the first time the defendant Richardson said that the new latch was put on after the accident.

Ehrgott filed his action against his son-in-law on January 23, 1948, at about 2:15 in the afternoon. On the day the suit was filed, Richardson and Ehrgott went to St. Louis together, both registering at the Baltimore Hotel at about 5:30 in the afternoon. They occupied separate rooms on the same floor of the hotel. Richardson claimed that he was going to St. Louis for the purpose of seeking another job; that he wanted a job in a smaller town. Ehrgott said that he was going for the purpose of looking at a doughnut machine in which he was interested. Richardson said that he had no knowledge that a suit had been filed against him and both said that the case was not discussed on the way to St. Louis. After Ehrgott arrived in St. Louis on the evening of January 23, he went to see his attorney Mattes at his hotel. The next morning Richardson was served with process and soon thereafter Richardson and Ehrgott left St. Louis for Quincy. Ehrgott did not look at a doughnut machine in St. Louis nor did Richardson apply for a job while there. Richardson in fact has the same job now that he had at the time of the occurrence of the accident.

The defendant Richardson claims that his first report on the printed form to the company was false. He explained making this false report of the accident in question by saying that he had a friend who was in the insurance business who told him that if he would report the accident in this fashion, it would make it easier for him and for his insurance company. He explained his second statement to the Company made October 25, 1946, by saying that he wanted to give the company a correct version of the way in which the accident happened and further, that he wanted to help his father-in-law Ehrgott, get compensation for being off work. Richardson testified further under cross examination that he did not wish to give the name of the person who advised him in connection with making his first report to the company because he promised this person he would not reveal his name. Richardson then said, when directed to give the name of this person, that he did not remember his last name, that his first name was Frederick, and he had known him only a year or two prior to the accident. Richardson's attention was then directed to his deposition which was taken under oath in August, 1948, in which he said that this person was a friend of his and he had known him for ten years. He admitted making this statement under oath when his deposition was taken.

In the determination of the rights of the parties under this contract of insurance it is conceded by all parties that the Illinois law is controlling. The case chiefly relied upon by defendants' counsel is Harrison v. United States Fidelity & Guaranty Co., 255 Ill.App. 263, where the court said: "In an action against an automobile owner's insurer for a part of the amount of a judgment recovered against the insured, whether the owner rendered all reasonable cooperation and assistance to the defendant as required by his liability insurance policy; whether he intentionally made false and fraudulent statements to the defendant as to the accident shortly thereafter: whether the defendant relied upon the same or it or its counsel was deceived thereby; and whether the owner after the accident and before the trial of the suit against himself fraudulently colluded with plaintiff to fasten ultimate liability for her injuries upon the defendant were questions of fact for the jury in view of the

pleadings, evidence and terms of the policy, and it was proper to refuse to direct a verdict for the defendant."

In this case there had been a verdict by a jury resolving the question of fact in favor of the plaintiff, who had recovered the judgment and was suing the insurance company for contribution. The question of fact having been resolved in favor of the insured, all the Appellate Court did was to affirm the judgment.

Most of the cases relied upon by defendants are garnishment suits. Such suits, of course, are brought by the judgment creditor against the insurance company after judgment has been recovered. For example, the case of Jackson v. Bankers Indemnity Ins. Co., 277 Ill.App. 140, is cited by defendants' counsel. In that case a judgment had been recovered for $4,000, following the verdict of a jury, for damages for personal injuries. After an execution on the judgment had been returned unsatisfied, a garnishment suit was commenced against the Bankers Indemnity Insurance Co. The Court there said: "What constitutes co-operation (or the lack of it) on the part of the assured, within the meaning and effect of co-operation clauses, is usually a question of fact."

The case of Rowoldt v. Cook County Farmers Mut. Ins. Co., 305 Ill.App. 93, 26 N.E.2d 903 was also a garnishment proceeding. It was urged, among other things, as a defense by the insurance company garnishee that the verdict in the plaintiffs' case was obtained by fraud and collusion between its insured Rowoldt and the plaintiffs in that case. With reference to this issue, the court said, 305 Ill.App. on page 101, 26 N.E.2d on page 906: "This was a question properly submitted to the jury."

▪ In the instant case counsel for the defendants contend that they are entitled to a judgment as a matter of law because the plaintiff failed to carry the burden of showing and proving that the statements the insured made as to how the accident happened were false. I cannot accept this reasoning. The Court, as the trier of the facts, is to determine from the evidence as a whole whether or not the insured did make material false statements to the plaintiff insurance company. Neither can I accept counsel's interpretation of the St. Louis trip. I think the circumstances of that trip cry out loudly and may be taken as absolute proof that there was collusion between the defendants in going to St. Louis. I do not believe that any reasonable person could reach a different conclusion. Their stories on the witness stand indicated circumstances sufficient for the Court to draw that conclusion.

Richardson says he was going down to apply for a job with a bus company because he wanted to get in a smaller place, but he did not do so. The father-in-law said he was going along because he wanted to see about a doughnut machine, but he did not make any effort while in St. Louis to see about a doughnut machine. They went down together, registered at the Baltimore Hotel, and as soon as Richardson was served with process they caught the bus at 1:00 o'clock and came back to Quincy. No one should expect me to believe there was not collusion there between these two men, collusion to have this suit brought in St. Louis, and what the purpose was is immaterial. It certainly did not spell co-operation on the part of Richardson with the insurance company. He was under obligation to render reasonable cooperation to the company. The company is not entitled to anything from the insured except the truth, but the company is entitled to no less than the truth on all occasions. This it did not get.

▪ Ehrgott may have a good case of wantonness and wilfulness on the part of the driver of the car, but Richardson has deprived himself of his indemnity by his knowingly false statements. The cases cited by counsel for defendants hold that the question of whether false statements are made knowingly or wilfully is a question of fact to be determined by the court or jury. Of course, if a person makes a misstatement, erroneously, that is not to be taken against him. Whether it is done intentionally is an issue of fact to be determined by the court or jury. Whether the insured intentionally made false and fraudulent statements to the plaintiff insurance company and whether the insur-

ance company relied upon them is also a question of fact.

█ There can be no question but that Richardson made his first statement of October 14 intentionally and knowingly. He says he made it upon the advice of some curbstone adviser in Chicago who had what he thought was valuable experience with an insurance company in matters of insurance, and thought he ought to frame up some false statement of facts in order to put himself in the right light with the insurer. There was nothing he needed to do and nothing any one needs to do at any time except be truthful, but in this Richardson failed. I am justified in disregarding his entire testimony in this proceeding.

The court in the California case of Home Indemnity Co. of New York v. Standard Acc. Ins. Co., 9 Cir., 167 F.2d 919, at page 924, made a very wholesome statement: "Truthfulness seems to be the keystone of the co-operation arch. The insured must tell his insurer the complete truth concerning the accident, and he must stick to this truthful version throughout the proceedings. He must not embarrass or cripple his insurer in its defense against a civil suit arising out of the accident, by switching from one version to another. He must not blow hot and cold to suit his personal convenience."

Of course, that is the keystone. It is the keystone of justice, and it is the keystone of court proceedings. A court cannot operate intelligently and wholesomely unless it can get the truth from witnesses. I am convinced that I did not get the whole truth from Richardson in this proceeding. Richardson was certainly guilty, if not of perpetrating an actual fraud, then of an attempted fraud upon the insurer in the various things he did.

█ It is the duty of the insured to give a full, frank and complete statement of the cause, conditions and circumstances of the accident and the conduct of the parties at the time in order that the insurer may properly present its defense. One of the leading cases on this subject is United States Fidelity & Guaranty Co. v. Wyer, 60 F.2d 856, a decision of the Circuit Court of Appeals, Tenth Circuit. In reversing a judgment for plaintiff the Court there quoted with approval the language of Justice Cardozo in Coleman v. New Amsterdam Casualty Co., 247 N.Y. 271, 160 N.E. 367, 369, 72 A.L.R. 1443, as follows: "Co-operation does not mean that the assured is to combine with the insurer to present a sham defense. Co-operation does mean that there shall be a fair and frank disclosure of information reasonably demanded by the insurer to enable it to determine whether there is a genuine defense."

The Circuit Court of Appeals for the Eighth Circuit, in Ohio Casualty Co. of Hamilton, Ohio v. Swan, 89 F.2d 719, at page 724, stated the rule simply, as follows:

"It is not to be inferred that co-operation in the policy sense requires that the insured should combine with the insurer to present an aggressive or sham defense; it does mean, however, 'that there shall be a fair and frank disclosure of information reasonably demanded by the insurer to enable it to determine whether there is a genuine defense.'"

It is my judgment that the defendant Richardson by reason of his acts and conduct and the conflicting and false statements given by him to the plaintiff insurance company and by reason of aiding and abetting his father-in-law, the defendant Louis Ehrgott, in and about the assertion and prosecution of his claim against him, has lost all benefits under the insurance contract to which he would have otherwise been entitled. Accordingly, I hold that the plaintiff, the Metropolitan Casualty Insurance Company of New York, is not obliged to defend the action at law instituted by the defendant, Louis Ehrgott, against Richardson in St. Louis, Missouri. I further hold that the plaintiff is not obligated to pay on behalf of the defendant Richardson any sum which said defendant is or might be obligated to pay by reason of the liability imposed upon him by law for damages alleged to have been sustained by the defendant Louis Ehrgott resulting from the accident in question.